L.J., An Infant, By and Through His Next Friend, Lydia Kaye DARR and; O.S., An Infant, By and Through Her Next Friend, Jackie Garner and; M.S., An Infant, By and Through Her Next Friend, Susan Leviton and; C.S., An Infant, By and Through Her Next Friend, Susan Leviton and; P.G., An Infant, By and Through Her Next Friend, Margaret Evans on Their Behalf and On Behalf of All Others Similarly Situated; R.K.; S.J., Plaintiffs–Appellees,

v.

Ruth W. MASSINGA, Individually and as Secretary of the Maryland Department of Human Resources; and; Frank Farrow, Individually and as Executive Director of the Maryland Social Services Administration; and; Joy Duva, Individually and as Director of the Office of Child Welfare Services, Maryland Social Services Administration; and; Bud Nocar, Individually and as Acting Program Manager Foster Care Services of the Maryland Social Services Administration; and; Alma Randall, Individually and as Program Manager for 24–Hour Group Care and Licensing of the Maryland Social Services Administration; and; Baltimore City Department of Social Services; and; George Musgrove, Individually and as Director of the Baltimore City Department of Social Services; and; Michael Warner-Burke, Individually and as Chief of Protective Services for the Baltimore City Department of Social Services; and; Cheryl Gibson, Individually and as Caseworker for the Baltimore City Department of Social Services; and; Bridgette Thomas, Individually and as Caseworker for the Baltimore City Department of Social Services; and; Marylyn Holcombe, Individually and as Caseworker for the Baltimore City Department of Social Services; and; Delores Cooper, Individually and as Caseworker Supervisor of the Baltimore City Department of Social Services; and; Gail Fulton, Individually and a Caseworker for the Baltimore City Department of Social Services;

and; Elvia Dewatkins, Individually and as Caseworker for the Baltimore City Department of Social Services; and; Dawn Zinkand, Individually and as Caseworker of the Baltimore City Department of Social Services; and; Jerilyn Simmons, Individually and as Caseworker for the Baltimore City Department of Social Services; and; Anthony Baird, Individually and as Caseworker for the Baltimore City Department of Social Services; and Susan Lieman, Individually and as Caseworker Supervisor for the Baltimore City Department of Social Services; and; Allen Collins, Individually and as Caseworker for the Baltimore City Department of Social Services; and; Susan Zuravin, Individually and as Caseworker for the Baltimore City Department of Social Services; and; Emma Graves, Individually and as Caseworker for the Baltimore City Department of Social Services; and; John Roes 1 Through 12, Individually and as Caseworkers for the Baltimore City Department of Social Services, Defendants–Appellants.

No. 87–2156.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 4, 1987.

Decided Feb. 1, 1988.

Judson Paul Garrett, Jr., Deputy Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Ralph S. Tyler, Asst. Atty. Gen., on brief), for defendants-appellants.

William Lee Grimm (Ethel Zelenske, Legal Aid Bureau, Inc., on brief), Ward Baldwin Coe, III (Nevett Steele, Jr., Whiteford, Taylor & Preston, Carol R. Golubock, Children's Defense Fund, on brief), for plaintiffs-appellees.

Before WINTER, Chief Judge, RUSSELL and MURNAGHAN, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

Plaintiffs, present or former foster children in the custody of the Baltimore City Department of Social Services, sued twenty-one state and city officials, caseworkers and supervisors who played a role in administering Maryland's federally-funded foster care program in Baltimore City. They alleged that, as a result of defendants' maladministration of the program, they were victims of physical and sexual abuse as well as medical neglect. They sought broad interim and permanent injunctive relief to redress the deficiencies in the administration of the program and money damages.

Defendants traversed the claims for injunctive and monetary relief and also specially pled their good faith immunity to damages for plaintiffs' claims prior to 1980 and our holding in *Jensen v. Conrad*, 747 F.2d 185 (4 Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985).

The district court heard and decided defendants' claim for qualified immunity and plaintiffs' claim for interim injunctive relief. It granted a preliminary injunction requiring defendants to submit a plan for review of foster homes about which a report of maltreatment has been made, to monitor child placements in foster homes at least monthly and in some instances weekly, to expand its medical services to foster children including the keeping of medical records, and to provide prompt written reports of maltreatment of foster children to their attorneys and the juvenile court including the action taken thereon. It denied defendants' claim of immunity, and it imposed attorneys' fees and expenses as sanctions on defendants, in an amount yet to be determined, for their failure to comply with two court orders.

Defendants appeal, and we affirm.

## I.

As a preliminary matter, we state our jurisdiction to entertain all aspects of this appeal. We, of course, have jurisdiction to review the grant of a preliminary injunction by the express language of 28 U.S.C. § 1292(a)(1). We also have jurisdiction to review the district court's denial of defendants' claim of qualified immunity under the holding in *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). We proceed therefore to review the correctness of both rulings.

## II.

■ In concluding to grant a preliminary injunction, the district court correctly considered each of the factors set forth in the leading case in this circuit, *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4 Cir.1977). There we held that four factors are to be considered: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest. *See Federal Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 499 (4 Cir.1981). As *Blackwelder* set forth, the two most important factors are the likelihood of irreparable harm to the plaintiff if interim relief is not granted and the likelihood of irreparable harm to the defendant if interim relief is granted. The two factors should be weighed against one another, and if the balance is in favor of the plaintiff, it is proper to grant interim injunctive relief if grave or serious questions are presented for ultimate decision. *Blackwelder*, 550 F.2d at 196. *See also Jones v. Bd. of Governors of Univ. of North Carolina*, 704 F.2d 713, 715 (4 Cir.1983); *Fort Sumter Tours, Inc. v. Andrus*, 564 F.2d 1119, 1124–25 (4 Cir.1977).

■ The district court found that there was the likelihood of irreparable harm to the plaintiffs if interim relief were not granted on a dual basis. It found this likelihood as a matter of fact after conducting an evidentiary hearing at which it heard testimony and received other evidence, and it found this likelihood as a matter of law as a sanction for certain defaults and omissions on the part of defendants' lawyers. Because we think that the factual finding of the likelihood of irreparable harm to plaintiffs is not clearly erroneous, we conclude that it is unnecessary for us to consider the appropriateness of the sanction that it be considered as established "that defendants fail to protect effectively children in foster homes where there is reason to know that such children are at risk of harm to their physical and emotional well-being."[1] We express no view of the appropriateness of the additional sanction of attorney's fees and expenses in an amount yet to be determined. While the record reflects some defaults on the part of defendants' counsel, we do not

---

1. Order of the district court entered July 27, 1987. J.A. 506.

think that this aspect of the case is properly before us until the amount and form of the sanction are fixed.

As a factual matter, plaintiffs presented a statistical study of the case records maintained by the officials on children in foster care prepared by an expert in research methodology and child welfare services. The study documented systemic problems in the Baltimore foster care program with grave consequences to children in the program and great likelihood of irreparable harm. In addition there was testimony by relatives and expert witnesses regarding the cases of sixteen children who had recently been severely abused or neglected, or both, while in foster care. Finally there was testimony from several experts on foster care to the effect that there were systemic deficiencies in the foster care program which placed the children at substantial risk of severe harm, including the testimony of two physicians experienced in the medical care provided to children in foster care, who concluded that defendants were failing to take responsible measures to ensure foster children essential and basic medical care, placing them at risk of severe diseases and other illnesses.

Defendants sought to counter this proof by attacking the methodology of the statistical sample and evidence of the so-called Report of the Harris Task Force, an internal study, which detailed deficiencies in the foster care program and made recommendations for their alleviation, together with proof of the corrective actions they had taken. As to the latter, the district court made full and persuasive findings as to why defendants' responses to the problems identified by the Harris Task Force were ineffective and incomplete. We cannot say that these findings lack full evidentiary support. Nor do we think that plaintiffs' statistical study was flawed or that its findings must be disregarded. In our view the statistical sample was significant. It was based on a random selection of 897 of the roughly 4,000 children in the foster program, which was further refined by the use of sampling criteria to a pool of 224 children. The district court found 15 well-founded cases of abuse or neglect in the sample and further indicated that the pool may contain up to 24 additional such cases. We see no abuse of discretion on the part of the district court in affording the study substantial probative value.

Defendants' proof of irreparable injury to it should interim relief be granted was evidence of the obvious—the monetary cost and administrative inconvenience to the city and state of a more encompassing administration of the foster child care program. In addition they argued to the district court and contend before us that principles of federalism protect them against federal judicial interference in the administration of a state program, absent convincing proof of deliberate indifference on their part to the plight of the victims of maladministration, if any.

We recognize that the considerations pressed on us by defendants are weighty. We note of course that if carried to their logical extreme, federal courts would be powerless to enforce federal rights in any case where enforcement would conflict with the rights of a state. Such is not the law and we think that, properly applied, the *Blackwelder* test recognizes that the interests of the state are to be fully respected and overridden only in those instances in which the apparent denial of a federal right is so egregious that the individual right to interim relief outweighs the governmental interest to be free from federal judicial interference. The element of deliberate indifference may be a substantial factor in the aspect of this case which seeks monetary recovery, but it is of little moment with regard to injunctive relief *in futuro* if plaintiffs can prove that defendants are not acting lawfully. In this case we cannot say that if, as will be later shown, plaintiffs have made a showing of probable success in their claim for permanent relief, the district court improperly balanced the respective rights of plaintiffs and defendants with regard to prospective injunctive relief. Defendants' real harm is the expenditure of money. Admittedly the supply of money is finite, but balanced against that is the emotional, psychological and physical damage to children, much of which will continue throughout their lives. In short, we see no basis on which to fault the district court

on how it balanced the equities and why it concluded that irreparable damage to plaintiffs if relief were not granted outweighed the injury to defendants if relief was granted.

Finally, consistent with *Blackwelder*, we have no doubt that plaintiffs' case presents a grave and substantial question. Defendants do not seriously contend with respect to prospective relief that if plaintiffs prove their allegations, which they have already demonstrated have an arguably solid foundation, plaintiffs will have proven a violation of their due process rights under the Fourteenth Amendment. *See Fox v. Custis*, 712 F.2d 84, 88 (4 Cir.1983) (rights may arise out of special custodial or other relationships created or assumed by the State in respect of particular persons). For the reasons that we will shortly discuss with respect to defendants' claim of qualified immunity, we think that plaintiffs will have also proven a violation of 42 U.S.C. § 608(f) (1961) and its subsequent amendments. Thus we affirm the district court's judgment granting a preliminary injunction.

### III.

■ In the district court defendants moved for partial summary judgment on the ground that they were immune to damage claims for action or non-action attributable to them prior to 1980. Later in argument before the district court and before us, they assert immunity even after 1980. Invoking the principle that immunity in the performance of discretionary duties exists where the law governing official conduct is unsettled, their claim for pre–1980 immunity was grounded on the argument that not until the decision in *Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980), was there recognized a constitutional right to protection on the part of persons in the custody of the state, except in the prison context, and that we recognized this uncertain state of the law in *Jensen v. Conrad*, 747 F.2d 185 (4 Cir. 1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985). Their claim for post–1980 immunity is grounded on the

argument that even now the law is uncertain as to whether they could reasonably be expected to know that placing children in their custody in an unsuitable foster home could constitute a violation of the constitutional rights of those children.[2]

The district court placed its denial of the immunity defense on the dual grounds that (a) during the period in litigation, there existed a constitutional right to protection on the part of those in the custody of the state or having a special relationship with the state, even out of the prison context, so that defendants could have reasonably expected to know that a failure on their part to protect foster children placed by them in foster homes selected by them could constitute a violation of plaintiffs' Fourteenth Amendment rights, and (b) since 1961 plaintiffs had a statutory right, enforceable under 42 U.S.C. § 1983, to the care and protection that they allege were denied, so that defendants could not be said to exercise discretion in an area in which the law respecting their duties and obligations was uncertain. We agree with the district court that defendants' statutory duty was clear and certain and therefore they are not entitled to invoke the immunity defense. Our conclusion makes it unnecessary to decide whether plaintiffs' constitutional rights were also violated prior to 1980 if they can prove what they have alleged.

The foster care program in Baltimore City is federally funded. In 1961 the funding statute created both the obligations of those administering the program and the rights of beneficiaries thereunder. That statute was part of the Aid to Families with Dependent Children program in Title IV–A of the Social Security Act, 42 U.S.C. § 608 (repealed by the Adoption Assistance and Child Welfare Act of 1980, Pub.L. 96–272). The original statute required states participating in the foster care program to develop "a plan for each such child [in foster care] (including periodic review of the necessity for the child's being in a foster family home or child-care institution) to assure that he receives proper care...." 42 U.S.C. § 608(f) (repealed in 1980). In

---

**2.** Defendants' argument deals only with the constitutional rights of foster children, because defendants argue that the foster children have no statutory rights which are enforceable under 42 U.S.C. § 1983. We touch on this argument in the text *infra*.

1980 and thereafter, the foster care program was made a separate title of the Social Security Act. 42 U.S.C. §§ 671, 675. Significantly, however, the duty to assure that a child in foster care receives "proper care" was continued and amplified. Titles IV–E and IV–B of the Social Security Act as it now exists contains the following relevant requirements. A State participating in the program is required to have a plan which provides for an agency "responsible for establishing and maintaining standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations concerned with standards for such institutions or homes, including standards related to admission policies, safety, sanitation, and protection of civil rights...." 42 U.S.C. § 671(a)(10).

In addition the eligibility of a State to receive an appropriation is conditioned upon its implementation and operation of "a case review system ... for each child receiving foster care under the supervision of the State...." 42 U.S.C. § 627(a)(2)(B). This requirement is repeated and amplified in 42 U.S.C. § 671(a)(16), which requires a State's plan to provide for "a case plan ... for each child receiving foster care maintenance payments ... [and] a case review system ... with respect to each such child." [3] Finally, 42 U.S.C. § 671(a)(9) requires a State's plan to provide that "where any agency of the State has reason to believe that the home or institution in which a child resides ... is unsuitable for the child because of the neglect, abuse, or exploitation of such child, it shall bring such condition to the attention of the appropriate court or law enforcement agency."

Taken together we think that these statutory provisions spell out a standard of conduct, and as a corollary rights in plaintiffs, which plaintiffs have alleged have been denied. It is true that the statutes are largely statutes relating to appropriations, but, defendants' argument to the contrary notwithstanding, they are privately enforceable under 42 U.S.C. § 1983. *See Miller v. Youakim,* 440 U.S. 125, 99 S.Ct. 957, 59 L.Ed.2d 194 (1979); *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed. 2d 442 (1970); *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Moreover the Supreme Court did not distinguish between prospective equitable relief and an action for money damages in regard to the right to enforce privately in *Wright v. Roanoke Redevelopment and Hous. Auth.,* —— U.S. ——, 107 S.Ct. 766, 770 n. 5, 773, 93 L.Ed.2d 781 (1987).

We therefore conclude that the district court correctly denied defendants' motion

---

**3.** "Case plan" and "case review system" are both elaborately defined in 42 U.S.C. § 675, the relevant text of which follows:

The term "case plan" means a written document which includes at least the following: A description of the type of home or institution in which a child is to be placed, including a discussion of the appropriateness of the placement and how the agency which is responsible for the child plans to carry out the voluntary placement agreement entered into or judicial determination made with respect to the child in accordance with section 672(a)(1) of this title; and a plan for assuring that the child receives proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan. Where appropriate, for a child age 16 or over, the case plan must also include a written description of the programs and services which will help such child prepare for the transition from foster care to independent living.

.   .   .   .   .

The term "case review system" means a procedure for assuring that—

(A) each child has a case plan designed to achieve placement in the least restrictive (most family like) setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child,

(B) the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by administrative review (as defined in paragraph (6)) in order to determine the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, and the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care, and to project a likely date by which the child may be returned to the home or placed for adoption or legal guardianship....

for summary judgment on the ground of immunity and we affirm its ruling. We should not be understood, however, to mean that defendants or any of them are necessarily liable for money damages. Their right to claim immunity must be determined by an objective test rather than their subjective good faith belief, *see Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), and we decide only that objectively, to the extent that they had discretion in the exercise of their duties, they would not be justified in doing or in failing to do what is alleged, if that be proven.[4] The proof, however, of the alleged actionable nonfeasance and malfeasance must await further proceedings in the district court.

AFFIRMED.

---

**4.** In view of this conclusion we do not consider what discretion, if any, is vested in any particular defendant in the performance of his duties under the program.