**GOVERNMENT OF THE DOMINICAN REPUBLIC and Secretariat of State of the Environment and Natural Resources of the Dominican Republic, Plaintiffs,**

v.

**AES CORPORATION, AES Aggregate Services, Ltd., AES Atlantis, AES Puerto Rico, L.P., Silver Spot Enterprises, and Roger Charles Fina, Defendant.**

**No. CIV.A.06 313.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 5, 2006.

---

Susan L. Burke, Esquire, Burke Pyle, LLC, Philadelphia, PA., for Plaintiff's Attorney's.

Dane Hal Butswinkas, Esquire, Williams & Connolly LLP, Washington, DC, for Defense Attorney's.

## MEMORANDUM ORDER

LEE, District Judge.

THIS MATTER is before the Court on Defendant AES Corporation, AES Aggregate Services, Ltd., AES Atlantis, AES Puerto Rico, L.P., Silver Spot Enterprises, and Roger Charles Fina's Motion to Dismiss. The Government of the Dominican Republic ("Dominican Republic") brought this suit complaining that several American companies polluted Samana Bay and Manzanillo by dumping coal ash. There are five issues before the Court. First, the Court must decide whether the Dominican Republic has standing to assert claims of nuisance, product liability, aiding and abetting the violation of laws prohibiting bribery and regulating waste disposal, and civil conspiracy to violate the laws prohibiting bribery and regulating waste disposal. Second, the Court must decide whether the Dominican Republic's RICO claims are deficient as a matter of law because (a) they fail to allege a "pattern" under RICO and (b) "the cognizable predicate acts of wrongdoing alleged by Plaintiffs were not the proximate cause of Plaintiffs' alleged injuries." (Defendants' Memorandum of Law in Support of the AES Defendants' Motion to Dismiss at 2, *Dominican Republic v. AES Corp.*, No. 06–313, 2006 WL 3692617 (E.D.Va.2006) (No. 14) ("Def.'s Br.").) Third, the Court must decide if RICO applies extra-territorially. Fourth, the Court must decide whether Virginia choice of law principles require the law of the Dominican Republic to govern Plaintiff's claims and, if so, whether the law of the Dominican Republic recognizes the common law causes of action asserted. Finally, the Court must decide whether the act of state doctrine bars this Court from adjudicating the case because the Dominican Republic issued a permit to the Defendants to dump coal ash at one point in time.

The Court holds that the Government of the Dominican Republic has standing to sue in the United States of America ("United States") courts because the United States recognizes the Dominican Republic, is not at war with the Dominican Republic, and the Dominican Republic meets traditional standing requirements on the facts alleged. Further, the Court dismisses Plaintiff's RICO claims (Counts One and Two of the First Amended Complaint) because the First Amended Complaint fails to allege sufficient "continuity" to establish a pattern of racketeering activity. In the alternative, the Court dismisses Plaintiff's RICO claims because the First Amended Complaint fails to allege proximate cause of the injury. In addition, the Court denies the Defendant's Motion to Dismiss several common law claims because the Court finds that the law of the Dominican Republic encompasses actions for nuisance, civil conspiracy, and aiding and abetting claims, and Dominican Republic law governs the claims. The Court dismisses the product liability claim because both parties agree that the coal ash is not a "product." Finally, the Court further finds that the act of state doctrine does not bar Plaintiff's claims because a public act is not at issue.

## I. BACKGROUND

The Government of the Dominican Republic alleges that the AES Corporation

("AES") formed a civil conspiracy to carry out several illegal acts (including bribery and death threats) in order to dispose of hazardous coal ash in a manner less expensive than safe disposal. (First Amended Complaint ("FAC") at ¶¶ 1, 4, 12, 20, *Dominican Republic v. AES Corp.*, No. 06–313, 2006 WL 3692617 (E.D.Va.2006) (No. 2).) Because the Government of the Dominican Republic does not think its own courts can resolve this matter in a fair and impartial manner, it brought suit in the Eastern District of Virginia. (FAC at ¶ 20.) The Dominican Republic alleges that the AES conspiracy polluted Manzanillo and Samana Bay, wrecked the beach, caused nearby residents to suffer physical injuries that required the state-run healthcare system to provide medical care, hampered tourism, and caused business in the region to suffer. (FAC at ¶¶ 16, 33–53.) In addition, some inhabitants of the Dominican Republic have suffered respiratory problems from breathing polluted air which the state-run healthcare system has addressed. (FAC at ¶¶ 35–38,43–46.)

For the purposes of this motion, the Court assumes the following facts are true. AES of Arlington, Virginia, is the parent company of more than 700 subsidiaries, including AES Puerto Rico, AES Atlantis, and AES Aggregate Services ("AES Defendants"). (FAC at ¶¶ 5–8, 65.) AES Puerto Rico discovered that it could not find commercial uses for its coal ash, a byproduct of its coal burning power plant. (FAC at ¶ 58.) Disposal costs for the 1000 tons of coal ash generated by the plant each day would have been substantial, approximately $100–200 U.S. per ton. (FAC at ¶ 58.) AES created AES Aggregate Services, Ltd., "a Cayman Islands subsid-

iary, to enter into a contract with Defendant AES Puerto Rico." (FAC at ¶ 60.) Plaintiff alleges that AES executive Sarah Slusser directed the formation of AES Aggregate Services while at AES headquarters in Arlington, Virginia, part of the idea being that AES could create the illusion that the Puerto Rico plant's ash would be disposed of in accord with relevant law. (FAC at ¶ 64.) When the initial contract between AES Puerto Rico and AES Aggregate Services to dispose of the ash in the Bahamas failed (because the Bahamas refused to accept it), AES hired Silver Spot Enterprises. (FAC at ¶ 66.)

The Government of the Dominican Republic alleges that AES hired Silver Spot Enterprises of Delray Beach, FL to transport the waste out of Puerto Rico. (FAC at ¶ 66.) Silver Spot Enterprises has a Dominican Republic subsidiary, Multigestiones Valenza ("MV"). (FAC at ¶ 68.) The entities negotiated the contract in Florida. (FAC at ¶ 66.) The Government of the Dominican Republic alleges that a conspiracy formed among the AES Defendants; Silver Spot;[1] MV; Trans Dominicana de Desarrollo ("TDD") (a Dominican company holding the concession for the port of Manzanillo); the former Undersecretary of Environmental Management in the Ministry of the Environment, Rene Ledesma; the former Director of the National Port Authority, Rosendo Arsenio Borges; and elected and unelected officials of the government of the Dominican Republic, including the municipal government of Manzanillo and provinces of Montecristi and Samana. (FAC at ¶ 11.) The object of the conspiracy involved disposal of tons of coal ash without incurring the costs of proper shipment and/or disposal. (FAC at

---

1. Defendants Silver Spot and Roger C. Fina join the Motion to Dismiss submitted by AES's counsel. (Joinder of the Silver Spot Defendants in the Motion of AES Defendants to Dismiss First Amended Complaint, *Dominican Republic v. AES Corp.*, No. 06–313, 2006 WL 3692617 (E.D.Va.2006) (No. 42).)

¶ 11.) In addition, Plaintiff alleges that the conspirators are conspiring currently to prevent discovery, investigation, and prosecution of their acts. (FAC at ¶ 13.) Plaintiff fears that if the courts of the Dominican Republic were to take up the issues, they would be unlawfully influenced in ways that could allow the Defendants to evade accountability for their actions. (FAC at ¶ 20.)

Plaintiff alleges that from October 2003 to March 2004, Defendants transported ten (10) barge-loads of compacted coal ash from Puerto Rico to the Dominican Republic. (FAC at ¶ 33.) The Dominican Academy of Sciences found that the coal ash had high levels of arsenic, cadmium, nickel, beryllium, chromium, and vanadium. (FAC at ¶ 52.) Four barges (on or about October 20, November 12, December 2, 2003 and January 18, 2004) left approximately 30,000 tons of coal ash in Manzanillo, exposed to the elements. (FAC at ¶ 34.) The flying unattended coal ash harmed nearby residents of the Manzanillo area; they experienced skin lesions, and several elderly residents and children had difficulty breathing. (FAC at ¶¶ 36, 37.) Several residents were hospitalized. The dumping contributed to, or resulted in, six (6) deaths and five (5) serious illnesses. (FAC at ¶ 38.) The waste destroyed a mangrove wetland. (FAC at ¶ 39.) Tourist activity declined dramatically. (FAC at ¶ 40.)

Samana Bay suffered major damage from the coal ash pollution also. While documents show that barges dumped 27,-000 tons of coal ash on Samana Bay beaches, eyewitnesses estimate 50,000 tons. Again, Defendants left the coal ash exposed to the elements. (FAC at ¶ 41.) Again, several residents were injured, suffering skin lesions and breathing difficulties. (FAC at ¶¶ 44, 45.) Six (6) residents were hospitalized with acute respiratory distress. (FAC at ¶ 46.) Samana Bay region tourism declined dramatically and has not improved; hotel occupancy decreased by 70 percent. (FAC at ¶ 47.) Local fish sales have declined. (FAC at ¶ 48.) Environmentalists and marine biologists have expressed concern about the possible effects on the whale population and the reputation of the Dominican Republic for protecting whales. (FAC at ¶ 50.)

The port of Manzanillo refused to allow the first barge into the Dominican Republic on October 20, 2003 because Silver Spot did not have a permit from the Environment Ministry. (FAC at ¶ 70.) District Attorney Arias aided in preventing the dumping. (FAC at ¶ 72–74.) District Attorney Arias was aware that after the country halted the attempted import of sewage from Philadelphia, Pennsylvania, the Dominican Republic passed a law forbidding the importation of biological, industrial, and residential waste. (FAC at ¶ 77.) Having failed to unload the ash in the Dominican Republic, Roger Charles Fina ("Fina"), owner of Silver Spot, attempted to unload in Haiti; when unsuccessful, he dumped twenty-five (25) percent into the Haitian coastal waters. (FAC at ¶ 70.)

Later, the Defendants acquired a permit from the Dominican Republic to dump ash. Plaintiff alleges that the Dominican Republic issued the permit without the proper review process or the environmental impact statement required by law in the Dominican Republic. (FAC at ¶ 71.) Originally, a "sham" contract between Silver Spot and TDD maintained the pretense that the coal ash would be used for commercial purposes; for example, it filled potholes. (FAC at ¶ 68.) Fina attempted twice in 2003 to bribe Congressman Rafael Emilio Betances with $40,000 in order to obtain permits and licenses to bring ash to

Manzanillo. (FAC at ¶ 76.) Betances rejected the offers. (FAC at ¶ 76.)

District Attorney Arias objected officially and publicly to Defendants disposal of the coal ash. District Attorney Arias claims his protests of the Silver Spot actions led to "harassment, attempted physical assault, death threats, and the attempted burning of his car." (FAC at ¶ 74.) He refused to accept a bribe from a TDD officer to stop opposing the ash disposal. (FAC at ¶ 74.) Plaintiff alleges that unnamed corrupt or coerced Dominican Republic officials fired Arias on or about May 9, 2004. (FAC at ¶ 75.)

Plaintiff alleges that AES Puerto Rico paid bribes to Dominican Republic government officials when its executives, Al Dyer and David Stone, traveled to the Dominican Republic. (FAC at ¶ 83.) Plaintiff alleges that the AES Corporation knew of the actions of its subsidiaries. (FAC at ¶ 83.) The Dominican Republic eventually revoked the permits. (FAC at ¶¶ 71, 84.)

The Dominican Republic seeks compensatory and punitive damages for environmental damages (including removing the ash, restoring local ecology, and monitoring cleanup), healthcare costs for injured residents, and economic damages for the loss of tourism. (FAC at ¶ 129.)

## II. DISCUSSION

### A. Standard of Review

A Federal Rule of Civil Procedure 12(b)(6) motion should not be granted unless it appears beyond a doubt that a plaintiff can prove no set of facts in support of the plaintiff's claim that would entitle the plaintiff to relief. FED. R. CIV. P. 12(b)(6); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept as true the allegations in the com-

plaint and construe all inferences in the plaintiffs' favor." *Allen v. Williams,* 254 F.Supp.2d 614, 622 (E.D.Va.2003) (citing *Edwards v. City of Goldsboro,* 178 F.3d 231, 244 (4th Cir.1999)); *see Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Flood v. New Hanover County,* 125 F.3d 249, 251 (4th Cir.1997). The purpose of the Rule 12(b)(6) motion is "to test the sufficiency of the pleadings and not to resolve factual issues or rule on the merits of the claim." *Id.* at 622 (citing *America Online, Inc. v. GreatDeals.Net,* 49 F.Supp.2d 851, 854 (E.D.Va.1999)). Thus, such a motion should be granted only if " 'it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.' " *Id.* at 622 (citing *Edwards,* 178 F.3d at 244); *see De Sole v. United States,* 947 F.2d 1169, 1177 (4th Cir.1991). The Fourth Circuit declared that "[l]iberal construction in favor of the plaintiff is mandated." *De Sole,* 947 F.2d at 1177 (citing *Coakley & Williams, Inc. v. Shatterproof Glass Corp.,* 706 F.2d 456 (4th Cir.1983)).

In addition, given that the "function of a motion to dismiss is to test the sufficiency of a complaint, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses". *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992) (internal citation and quotation marks omitted). In ruling on a Rule 12(b)(6) motion, a Court should keep in mind that as a matter of general course it is a "disfavored motion." *Hessek v. N. Am. Mortgage Ins. Servs.,* No. 2:02–CV–985, 2003 WL 23961817, at *3 (E.D.Va. Oct.17, 2003) (citation omitted).

### B. Analysis

Viewing the facts in the light most favorable to the Plaintiff, the Court holds

that the Government of the Dominican Republic has standing to bring suit in the United States because the United States recognizes the Dominican Republic, is not at war with the Dominican Republic, and the Government of the Dominican Republic meets traditional standing requirements. The Court grants the Defendants' Motion to Dismiss Plaintiff's RICO claims (Counts One and Two of the FAC) because the facts alleged are insufficient to establish a pattern of racketeering activity. In the alternative, the Court dismisses Plaintiff's RICO claims for failure to establish proximate cause on the facts alleged. In addition, the Court finds that Plaintiff's nuisance, civil conspiracy, and aiding and abetting claims are cognizable under the law of the Dominican Republic, and that this law should apply to the claims at issue. The Court grants the Defendants' Motion to Dismiss Plaintiff's product liability claim because both parties agree that the coal ash is not a "product." Finally, the Court finds that the act of state doctrine does not bar Plaintiff's claims because a public act is not at issue.

*1. Standing of Foreign Sovereigns to Bring Suit in United States District Court*

The Court holds that the Government of the Dominican Republic can bring suit in the United States federal court system because the United States government recognizes the Dominican Republic, is not at war with the United States, and meets all three traditional standing requirements.

■ Foreign sovereigns have standing to bring civil suit in the federal courts of the United States as long as they are recognized by the United States and at peace with the United States. *Pfizer v. Gov't of India*, 434 U.S. 308, 319, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978); *Pang–Tsu Mow v. Republic of China*, 201 F.2d 195, 198 (D.C.Cir.1953) (noting the Republic of China's standing was appropriate because

the country was "under no disability by statute or otherwise which might in time of war, for example, bar our courts to the governments of unfriendly nations."); *Principality of Monaco v. State of Miss.*, 292 U.S. 313, 323 n. 2, 54 S.Ct. 745, 78 L.Ed. 1282 (1934) (noting that there is "no question" that foreign states can sue in the federal courts of the United States of America).

■ Foreign sovereigns may bring civil claims in the same way as domestic corporations or individuals. *Pfizer*, 434 U.S. at 318–19, 98 S.Ct. 584. If the United States denied this privilege, it "would manifest a want of comity and friendly feeling." *Id.* (citing *The Sapphire*, 11 Wall. 164, 167, 20 L.Ed. 127; *Monaco*, 292 U.S. at 323 n. 2, 54 S.Ct. 745; *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 408–409, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *see* U.S. Const. art. III, § 2, cl. 1.).

■ Given that foreign sovereigns may sue as an individual or corporation might sue, they must meet traditional standing requirements. *Pfizer*, 434 U.S. at 318–19, 98 S.Ct. 584. In order to bring suit in federal court in the United States of America, "[l]itigants must have a sufficient personal interest in the outcome of the litigation in order to establish standing pursuant to Article III of the Constitution." *Allen*, 254 F.Supp.2d at 623 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "Standing to bring an action is a prerequisite to federal jurisdiction, for without it there is no case or controversy between the parties." *Siver v. Rockingham Mem'l Hosp.*, 48 F.Supp.2d 608, 610 (W.D.Va.1999). The foreign sovereign plaintiff must meet three (3) elements in order to establish standing in United States federal court: "(1) that they suffered an 'injury in fact' that is (a) concrete

and particularized and (b) actual or imminent, not conjectural or hypothetical;' (2) that the injury is 'fairly traceable to the challenged action of the defendant;' and (3) that the injury is likely to be redressed by a favorable decision by the court." *Allen*, 254 F.Supp.2d at 623 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130)). Plaintiffs " 'must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements.' " *Charles E. Smith Mgmt., Inc. v. Aspin*, 855 F.Supp. 852, 856 (E.D.Va.1994) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). Courts may not infer standing "argumentatively from averments in the pleadings." *Id.* (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)). If a "distinct and palpable injury" cannot be established, the complaint may be dismissed without further inquiry. *Id.* (citation omitted).

■ Viewing the facts in the light most favorable to the Plaintiff, the Court holds that the Government of the Dominican Republic can bring suit in the United States federal court system because the Dominican Republic is recognized by the United States government, and the United States is not at war with the Dominican Republic. The Dominican Republic has standing to bring suit for compensatory damages to remediate the pollution damages to Manzanillo and Samana Bay because all three standing requirements, as detailed in *Allen*, 254 F.Supp.2d at 623, are met. First, the Dominican Republic suffered a concrete and actual injury when the coal ash dumped by Defendants contaminated its land and waters. (FAC at ¶ 89.) Second, the injury is fairly traceable to the conduct of the Defendants. Finally, this Court can offer monetary damages, a remedy that will enable the Dominican Republic to remediate the pollution damage. (FAC at ¶ 90.)

■ However, the Government of the Dominican Republic does not have standing to assert claims for a general decline in tourism. While the Plaintiff has alleged harm to the tourist industry by facts such as the decline in hotel occupancy by seventy (70) percent in the Samana Bay region (FAC at ¶ 47), the injury is not concrete enough to establish standing. The Court would need to do complex calculations to determine appropriate compensation. In addition, the tourist industry suffered the injury, not the Government of the Dominican Republic directly. (FAC at ¶ 31.) Thus, Plaintiff does not have standing to assert claims for a decline in tourism.

Likewise, the Government of the Dominican Republic does not have standing to assert claims for the costs its state-run health system incurred in caring for inhabitants injured by the coal ash pollution. The Government may be able to prove that the State health system suffered an injury that was concrete and actual when it had to cope with the needs of patients suffering from skin lesions, breathing difficulties among children and the elderly, "serious illnesses," and several deaths. (FAC at ¶¶ 35–38, 43–46.) The injuries were fairly traceable to the effects of the coal ash, and can be redressed by the Court (presumably by awarding compensation). However, the injuries were suffered by specific persons, and thus, even though they did not pay for their treatment, each person injured must individually sue (even if aided by the government in doing so).

Defendants suggest that *parens patriae* standing may be at issue here. The Court will not apply *parens patriae* on these facts. The modern American legal concept of *parens patriae* allows a sovereign to

assert an injury to a "quasi-sovereign" interest. *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 600–01, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). Because Plaintiff meets traditional standing requirements and has not asserted standing under the doctrine of *parens patriae,* there is no need to consider whether or not *parens patriae* applies based on the facts alleged.

## 2. Sufficiency of RICO claims

The Court grants the Defendants' motion to dismiss Plaintiff's RICO claim under Count One of the First Amended Complaint because a pattern of racketeering activity has not been established, as required by 18 U.S.C. § 1962(c), on the facts alleged. In the alternative, even if a pattern of racketeering activity had been established by Plaintiff, Count One is dismissed because the predicate acts alleged by the Plaintiff were not the proximate cause of the Plaintiff's alleged injuries. In addition, because Plaintiff has not established a pattern under 18 U.S.C. § 1962(c), Count Two of the First Amended Complaint alleging a conspiracy under RICO must also be dismissed.

The Racketeer Influenced and Corrupt Organizations Act ("RICO" or "Act"), Pub.L. No. 91–452, Title IX, 84 Stat. 941, as amended, 18 U.S.C. §§ 1961–1968 (Supp. V 1982), imposes criminal and civil liability upon those who engage in certain "prohibited activities." 18 U.S.C. § 1962. Congress enacted a statute that was "not limited in application to organized crime," though that was a "focus"; the statute responded to a "new situation in which persons engaged in long-term criminal activity often operate *wholly* within legitimate enterprises." *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 248, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Each prohibited activity is "defined in 18 U.S.C. § 1962 to include, as one necessary element, proof

either of 'a pattern of racketeering activity' or of 'collection of an unlawful debt.' " *Id.* at 232, 109 S.Ct. 2893. The statute lists four (4) prohibited activities: (1) § 1962(a), using or investing income derived " 'from a pattern of racketeering activity' " "to acquire an interest in or to operate an enterprise engaged in interstate commerce"; (2) § 1962(b), acquiring or maintaining "an interest in or control of such an enterprise " 'through a pattern of racketeering activity;' " (3) § 1962(c), a person "employed by or associated with such an enterprise, [who] conducts or participates in the conduct of its affairs 'through a pattern of racketeering activity' "; or (4) § 1962(d), conspiring to violate the first three subsections. *Id.* at 232–33, 109 S.Ct. 2893 (quoting § 1962).

The remedies for RICO violations are "drastic." *Id.* at 232–33, 109 S.Ct. 2893. Those found civilly liable for a pattern of racketeering activity under RICO are liable for treble damages and the costs of the suit (which includes reasonable attorney's fees). 18 U.S.C. § 1964(c). "RICO liability is reserved" for "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." *GE Inv. Private Placement Partners II v. Parker,* 247 F.3d 543, 548 (4th Cir.2001) (citing *Menasco, Inc. v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989)). It should be noted that if a substantive RICO claim is not established, a RICO conspiracy claim will fail also. *Id.* at 543, 551 n. 2 (citation omitted).

### a. Pattern of Racketeering Activity

The Court holds that Plaintiff's First Amended Complaint fails as a matter of law to assert a "pattern of racketeering" under RICO because the continuity test is not met.

The Supreme Court fleshed out the definition of "pattern of racketeering activity"

in *H.J.*, 492 U.S. 229, 109 S.Ct. 2893. In essence, the Court found that the statutory definition of "pattern" requires two predicate acts as the minimum necessary condition to state a RICO claim. *Id.* at 236, 109 S.Ct. 2893. The legislative history of RICO indicates that Congress intended prosecutors or plaintiffs to prove that the racketeering predicates relate and "amount to or pose a threat of continued criminal activity." *Id.* at 238, 109 S.Ct. 2893. RICO requires Plaintiff to allege continuity plus relationship to show a pattern of racketeering activity. *Id.* (citations omitted).

In order to analyze the issues more clearly, the Supreme Court suggests separating continuity and relatedness ("though in practice their proof will often overlap.") *Id.* at 239, 109 S.Ct. 2893. In general, patterns of racketeering activity involve at least two related acts that could potentially pose a threat of continued criminal activity. 18 U.S.C. § 1961(5); *GE Inv.*, 247 F.3d at 549; *Hessek*, 2003 WL 23961817, at *5. Predicate acts include numerous things; bribery, threats of murder, and wire fraud are most notable for our analysis.

■ Proof of multiple schemes will not necessarily satisfy the test for continuity. *H.J.*, 492 U.S. at 240, 109 S.Ct. 2893. As *Hessek* noted, "Continuity in criminal activity can be either open- or closed-ended." 2003 WL 23961817, at *5. Open-ended continuity can be demonstrated when past conduct, "by its nature projects into the future with a threat of repetition." *H.J.*, 492 U.S. at 241, 109 S.Ct. 2893 (citation omitted); *Hessek*, 2003 WL 23961817, at *5.

■ A series of related predicate acts that occur over a "substantial" time period may constitute closed-ended continuity. *Hessek*, 2003 WL 23961817, at *5 (citations omitted). There is no specific time period

that must be established; however, "[t]ime periods of less than two years have failed to provide the requisite period of time." *Id.* (citing *Menasco*, 886 F.2d at 684; *GE Inv.*, 247 F.3d at 550.) Given that Congress wrote the statute with long-term criminal conduct in mind, predicate acts that only extend over a period of a few weeks or months and do not threaten future criminal conduct will not suffice. *H.J.*, 492 U.S. at 242, 109 S.Ct. 2893.

While noting that the specific facts of each case are critical, *H.J.* decided to provide two examples to illustrate when RICO continuity would definitely be established. *Id.* The first example involves a "hoodlum" selling "insurance" to store owners; the insurance payments each month would prevent the hoodlum from breaking their windows. "Though the number of related predicates involved may be small, and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity." *Id.* A second example of a case that meets the continuity test involves predicate acts and offenses that are integrated into an entity's regular business practices. *Id.* at 242–43, 109 S.Ct. 2893. In addition, the continuity requirement would be satisfied if the predicate acts were "a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" *Id.* at 243, 109 S.Ct. 2893 (footnote omitted).

The element of relatedness may be defined by looking at the pattern requirement found in Title X of the Organized Crime Control Act of 1970 (OCCA), Pub.L. No. 91–452, 84 Stat. 922 (of which RICO existed as Title IX). *H.J.*, 492 U.S. at

239–40, 109 S.Ct. 2893. Following Title X, to be "related" for RICO purposes, the predicate acts need to have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing characteristics;" the acts should not simply be "isolated events." *Id.* at 240, 109 S.Ct. 2893 (citation omitted).

■ In some circumstances, a plaintiff could allege acts of related fraud against other victims in order to establish a "pattern" of activity. *GE Inv.*, 247 F.3d at 548 (citing *Menasco*, 886 F.2d at 685 (recognizing that RICO plaintiff could allege pattern if plaintiff alleged that other defendants had used similar schemes to defraud others)). In addition, Plaintiffs must plead "the circumstances of the fraudulent acts that form the alleged pattern of racketeering activity with sufficient specificity pursuant to Fed.R.Civ.P. 9(b)". *Menasco*, 886 F.2d at 684 (citing *Schreiber Distrib. Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1400–01 (9th Cir.1986)).

■ Viewing the facts at issue in the light most favorable to the Plaintiff, the Court grants the Defendants' motion to dismiss because Plaintiff has not established that the predicate acts it alleges satisfy the continuity test necessary to establish a "pattern of racketeering" under RICO. Only two of the predicate acts alleged by Plaintiff—bribery and a murder threat—withstand scrutiny. Two of the "predicate acts" alleged by the Plaintiff are not considered predicate acts under the RICO statute—violations of the Foreign Corrupt Practices Act and the Travel Act. 18 U.S.C. § 1961(1). (FAC at ¶¶ 94, 96.) Plaintiff's wire fraud allegations, as pled, do not meet the particularity requirement of Federal Rule of Civil Procedure 9(b); allegations that "defendants violated the law by making the [sic] false and fraudulent statement on at least one of the

manifests of the barge shipments to Samana that the ash was 'in transit' to Florida" (FAC at ¶ 81), fails to provide relevant details. *See Menasco*, 886 F.2d at 684. It should be noted that the Fourth Circuit is "cautious about basing a RICO claim on predicate acts of mail and wire fraud because it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *GE Inv.*, 247 F.3d at 549 (quoting *Al–Abood v. El–Shamari*, 217 F.3d 225, 238 (4th Cir.2000)) (internal quotations and citations omitted). Thus, after analyzing the RICO predicate acts alleged by Plaintiff only two remain: (1) bribery and (2) a threat to murder District Attorney Arias.

The predicate acts alleged by Plaintiff meet the RICO "pattern of activity" relatedness test, but not the continuity test. The relatedness test may be satisfied on these facts because the alleged murder threat and bribery both had a similar purpose—aiding in the disposal of coal ash within the Dominican Republic. However, the continuity test has not been met by Plaintiff on the facts as alleged because the First Amended Complaint fails to meet either the closed-ended or open-ended continuity standards. This case is similar to *Menasco* in which the court found no closed-ended continuity where there was only one set of victims, one perpetrator, and a one year time frame; in such a situation, the *Menasco* court found that if such a RICO claim were recognized, "the pattern requirement would be rendered meaningless." *Menasco*, 886 F.2d at 685. Here, similarly, there is one victim (the Government of the Dominican Republic), one perpetrator (AES Corporation), and a time frame of at most one year. Thus close-ended continuity has not been established on the facts alleged. The Eastern District of Virginia has found time periods of less than two years insufficient to estab-

lish closed-ended continuity. *Hessek*, 2003 WL 23961817, at *5. Congress wrote RICO with long-term criminal activity in mind; a year of activity, as alleged here, will not meet the standard. As *GE Inv.* found, despite the fact that Plaintiff has suffered a significant loss, RICO is a statute reserved for conduct with a " 'scope and persistence' " that poses a special threat. 247 F.3d at 551 (citing *Menasco*, 886 F.2d at 684). Thus, Plaintiff has not demonstrated that it meets the closed-ended continuity standard.

Plaintiff's allegations do not meet the open-ended continuity test. *See Menasco*, 886 F.2d at 684. While Plaintiff alleges that a conspiracy to prevent discovery of the Defendants' crimes exists (FAC at ¶ 13.), Plaintiff also alleges that the conspiracy to illegally dump coal ash has ended. (FAC at ¶ 84.) There was no indication in the First Amended Complaint that Plaintiff anticipated the alleged illegal dumping activities would occur again in the future. Given that there is no distinct threat of long-term racketeering activity inherent in the predicate acts, Plaintiff has not established open-ended continuity under RICO. There is no indication that bribes will occur indefinitely into the future (as in the "hoodlum" example given by the *H.J.* Court), or as part of regular business practices.[2]

Thus, Plaintiff, on the facts alleged, fails to establish a pattern of racketeering under RICO. While the predicate acts Plaintiff alleges may meet the relationship test, they do not meet the continuity test. Accordingly, the Court dismisses Count One of Plaintiff's complaint. Given that Count One alleging a pattern of racketeering activity under § 1962(c) is dismissed, the RICO statute indicates that Count Two (alleging a conspiracy under RICO

§ 1962(d), which is based on § 1962(c)), must also be dismissed.

### b. Proximate Cause

Given that a pattern of racketeering activity cannot be established, the Court will not need to address the proximate cause issue; however, even if the Court reached this stage of the analysis, Plaintiff's RICO claim would fail because of the absence of proximate cause.

The Supreme Court held that plaintiffs suing under 18 U.S.C. § 1964(c) must establish that the alleged RICO violation was a proximate cause of the plaintiffs' injury. *Anza v. Ideal Steel Supply Corp.*, — U.S. —, —, 126 S.Ct. 1991, 1994, 164 L.Ed.2d 720 (2006) (citation omitted). The Court's main focus in determining if proximate cause exists is to ascertain whether or not the alleged violation "led directly to the plaintiff's injuries." *Id.* at 1998. The Court examines " 'whether the conduct has been so significant and important a cause that the defendant should be held responsible.' " *D'Addario v. Geller*, 264 F.Supp.2d 367, 388 (citing *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir.1996) (citations omitted)). A RICO action does not lie when injuries are "more appropriately attributable to intervening causes that were not predicate acts under RICO." *Mid Atlantic Telecom, Inc. v. Long Distance Servs.*, 18 F.3d 260, 263 (citation omitted). If proximate cause cannot be established, the Court may dismiss the RICO claim. *Hessek*, 2003 WL 23961817, at 4 (citations omitted).

On these facts, bribery and a threat of murder did not directly cause injury to Plaintiff's land. The alleged mishandling of the coal ash (which is not a

---

**2.** Related fraud against other possible victims has not been alleged either, though Plaintiff

does refer to the Bahamas and Haiti refusing to take the ash. (FAC ¶¶ 66, 70.)

RICO predicate act) seems to be the direct cause of the Plaintiff's injury. Because proximate cause cannot be established on the facts as alleged, this Court dismisses Plaintiff's RICO claim, in the alternative, based on lack of proximate cause.

### 3. Extraterritorial application of RICO

Because this Court determines that Plaintiff's RICO claims should be dismissed, there is no need for this Court to pass upon the issue of the extraterritorial application of RICO.

In sum, viewing the facts in the light most favorable to the Plaintiff, the Court dismisses Plaintiff's RICO claims under Counts One and Two based on failure to establish a pattern of racketeering activity on the facts as alleged. In the alternative, the Court dismisses Plaintiff's RICO claims based on failure to establish proximate cause on the facts as alleged. Because no RICO claims remain, the Court does not need to address the extraterritorial application of RICO.

### 4. Choice of Law

■ The Court finds that the law of the Dominican Republic applies to Plaintiff's claims of nuisance, civil conspiracy to violate laws prohibiting bribery and regulation of waste disposal, and aiding and abetting the violation of laws prohibiting bribery and regulation of waste disposal. The Court dismisses the product liability claim because neither party considers the coal ash at issue to be a "product."

Virginia choice of law rules govern tort actions filed in the Eastern District of Virginia. *Milton v. IIT Research Inst.,* 138 F.3d 519, 521 (4th Cir.1998). Virginia applies the law of the place of the wrong. *Id.* at 521; *Rahmani v. Resorts Int'l Ho-*

tel, Inc., 20 F.Supp.2d 932, 937 (E.D.Va. 1998). "The place of the wrong or injury is the place where the injury was suffered, not where the tortious act took place." *Rahmani,* 20 F.Supp.2d at 937 (citations omitted).

The Court finds, under Virginia choice of law principles, that the law of the Dominican Republic applies to Plaintiff's nuisance, civil conspiracy, and aiding and abetting claims because the place of injury occurred where the coal ash was dumped in the Dominican Republic. In *Milton,* despite the fact that the plaintiff experienced lost income and emotional distress from his wrongful discharge while in Virginia, the law of Maryland applied because that was the location of the discharge. *Milton,* 138 F.3d at 521. Although Plaintiff uses *Milton* to argue that the place of the wrong could be Virginia, Puerto Rico, or Florida (in addition to the Dominican Republic), the nuisance plainly occurred in the Dominican Republic.

Viewing all facts in a light most favorable to the Plaintiff, this Court finds that the law of the Dominican Republic recognizes claims for common law nuisance, civil conspiracy, and aiding and abetting. The Attorney General for Defense of the Environment and Natural Resources for the Dominican Republic, Andrés M. Chalas Velázquez, stated under oath that the Dominican Civil Code allow claims for nuisance. (Dominican Republic's Opposition to AES Defendants' Motion to Dismiss("Pl.'s Br."), Attorney General Velázquez Decl. at ¶ 9, *Dominican Republic v. AES Corp.,* No. 06–313, 2006 WL 3692617 (E.D.Va.2006) (No. 31).) Specifically, he cited Articles 1382–1383 of the Dominican Civil Code.[3] The Dominican

---

**3.** Article 1382 states: "Any act of man that causes damage to another requires the former through whose fault it occurred to repair it."

Article 1383 states that "[e]veryone is liable for the damage he causes, not only through an act of his, but also through his negligence

Republic also has a cause of action for persons harmed by the environmental releases of others. (Pl.'s Br. at 16 (citing Attorney General Velázquez Decl. at ¶ 9 (citing Art. 169 of Law 64–00)); Pl.'s Br., Lead Attorney for Legal Office of the Secretary of State for the Environment and Natural Resources Marisol Castillo Collado at ¶ 11).

In addition, the Attorney General stated that criminal proceedings do not need to take place before a Plaintiff can bring a civil suit for conspiracy and aiding and abetting—civil actions of this type may be pursued with penal actions, or they can be filed separately before civil courts. (Plaintiff's Notice of Supplemental Declarations, Andrés M. Chalas Velázquez at ¶ 4, *Dominican Republic v. AES Corp.*, No. 06–313, 2006 WL 3692617 (E.D.Va.2006) (No. 49.) ("Pl.'s Supp. Decl."); Pl.'s Br., Declaration of Pérez Gómez at ¶ 6.) Also, Attorney Pérez Gómez stated that Article 167 of the General Law of the Environment and Natural Resources, Law 64–00 ("Law 64–00"), allows the Government of the Dominican Republic itself to claim damages independent of penal actions. (Pl.'s Supp. Decl. at ¶ 3.) In addition, the Secretary of State for the Environment and Natural Resources may bring an action for damages before a civil court even if the penal action is abandoned or an administrative penalty imposed. (Pl.'s Supp. Decl., Lead Attorney Collado at ¶¶ 3–4.)

Therefore, viewing the facts in a light most favorable to the Plaintiff, the Plaintiff has cognizable claims for nuisance, conspiracy, and aiding and abetting under the law of the Dominican Republic, and the law of the Dominican Republic should be applied to those claims.

### 5. Product Liability

The Court dismisses the product liability claim because both parties acknowledge that the coal ash at issue is not a "product" under the law of the Dominican Republic (Reply Memorandum of Law in Further Support of the AES Defendants' Motion to Dismiss ("Def.'s Reply") at 17, *Dominican Republic v. AES Corp.*, No. 06–313, 2006 WL 3692617 (E.D.Va.2006) (No. 33).) Plaintiff states that it only continued to call the ash a "product" because the Defendant used the word "product." (Pl.'s Br. at 17.) Because Defendant agrees that the ash is not a product (Def.'s Reply at 16–17), this claim is dismissed.

### 6. Act of State Doctrine

 The Court denies the Defendants' motion to dismiss because the act of state doctrine does not apply to this case. "[I]nternational comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations" provide the foundation for the act of state doctrine. *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Intern.*, 493 U.S. 400, 408, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 697, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). In order for the act of state doctrine to apply, the outcome of the case must turn upon the act at issue. *W.S. Kirkpatrick*, 493 U.S. at 406, 110 S.Ct. 701. The Court must be required "to declare invalid an official act of a foreign sovereign performed within its own territory." *Id.* at 405, 110 S.Ct. 701. In the Eastern District of Virginia, the act of state doctrine applies when: (1) the act undertaken by the foreign state is public, and (2) the foreign state completes the act within the its territory. *Eckert*, 834 F.Supp. at 171 (ruling that the act of state doctrine did not apply because there was

or imprudence." Pl.'s Br., Attorney General Velázquez at ¶ 9.

no public act involved, but rather a commercial one). The act of state doctrine does not cover private and commercial acts of sovereign states. *Id.* at 171.

■ Even if the above elements were not met, the Court could still apply the act of state doctrine; the "doctrine does not take the form of an absolute or inflexible rule, but rather requires a careful case-by-case analysis to determine if, in a particular situation, the conduct of foreign affairs by the executive branch is likely to be vexed or hindered by judicial review of the acts of a foreign government.'" *Id.* at 171 n. 5 (citations omitted). As the Supreme Court noted in *Sabbatino,* "some aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches." 376 U.S. at 428, 84 S.Ct. 923.

■ Viewing the facts in a light most favorable to the Plaintiff, the Court holds that the act of state doctrine does not apply in this case because this case does not require the court to adjudicate the validity of the Dominican Republic coal ash dumping permit. In order for the act of state doctrine to apply, the outcome of the case must turn upon the public act at issue which occurred in a foreign country. *W.S. Kirkpatrick.,* 493 U.S. at 406, 110 S.Ct. 701. Here, the Government of the Dominican Republic issued a permit, a public act, that allowed the dumping of coal ash. (FAC at ¶ 71.) Ordinarily, this would trigger the act of state doctrine and cause the Court to dismiss the case because there is no Fourth Circuit case law providing exceptions to the act of state doctrine. However, the outcome of this case does not turn upon the issuance of a permit, but rather upon the damage to the beaches. This lawsuit is not seeking an adjudication of the validity of the Dominican Republic permit; rather this lawsuit is to recover monetary damages for pollution of the land and bay. In addition, the Eastern District of Virginia has found that the act of state doctrine is not an "inflexible" rule, but rather requires case-by-case analysis to ensure that none of the underlying principles are violated. *Eckert,* 834 F.Supp. at 171. Given that the Government of the Dominican Republic itself is the plaintiff in this case, the principles that the act of state doctrine was created to uphold should not be adversely affected (i.e. the American executive should not be embarrassed, and international comity and respect for foreign sovereigns will continue).

## III. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that the Defendants' Motion to Dismiss for lack of standing is DENIED. It is further

ORDERED that Defendants' Motion to Dismiss for failure to establish a pattern of racketeering activity and/or lack of proximate cause under RICO is GRANTED. It is further

ORDERED that Defendants' Motion to Dismiss for failure to state a claim cognizable under the law of the Dominican Republic is DENIED. It is further

ORDERED that Defendants' Motion to Dismiss for failure to establish a product liability claim under the law of the Dominican Republic is GRANTED. It is further

ORDERED that Defendants' Motion to Dismiss for stating a claim that would cause the Court to violate the act of state doctrine is DENIED.

The clerk is directed to forward a copy of this Order to counsel.